No. 710 October 9, 2024 377

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVEN DOUGLAS SILVER,
*Defendant-Appellant.*

Yamhill County Circuit Court
21CR20689; A177928

Cynthia L. Easterday, Judge.

Argued and submitted January 19, 2024.

Daniel C. Silberman, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Robert M. Wilsey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Reversed.

**SHORR, P. J.**

Defendant appeals from a judgment of conviction for disorderly conduct in the second degree for obstructing vehicular traffic on a public way, ORS 166.025(1)(d). Defendant assigns error to the trial court's denial of his motion for judgment of acquittal (MJOA), arguing that the evidence supporting his conviction was legally insufficient to constitute obstruction of vehicular traffic. Defendant maintains that there was no evidence that he physically impeded traffic and, at most, his conduct off the side of the road may have only visually distracted drivers, causing them to slow down. The state contests defendant's interpretation of the word "obstructs" in ORS 166.025, contending that a person may obstruct traffic even if they do not physically obstruct the roadway. We ultimately conclude that the statute requires that the state prove that defendant physically impeded traffic. Applying that understanding of the statute, we conclude that there was insufficient evidence to support the conviction. As a result, we reverse.

When reviewing the denial of a motion for a judgment of acquittal, we determine "whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). We state the facts below in a manner consistent with that standard.

Defendant rented a trailer owned by Dr. Marion Hull and lived on a driveway on her property for approximately two years. After defendant stopped paying rent, Hull gave him notice to leave. Defendant moved out within a month. On April 13, Hull was working at the medical center where she was employed and saw that defendant had parked his vehicle on the far side of Highway 18 "on the side of the road." Defendant displayed signs along the side of the vehicle that made derogatory statements about Hull. On the previous day, Hull saw defendant parked in a similar location, sitting on the end of his vehicle, and looking at his phone.

On April 13, a witness, Martinez, was driving on the other side of Highway 18, which he described as pretty

busy that morning, when he saw defendant's vehicle "pulled over to the side with signs and some debris starting to fly off." Martinez saw defendant walking near the vehicle and called 9-1-1 to report seeing defendant. Martinez reported that defendant was on the *side* of the road, putting up signs, and "kind of obstructing traffic." Martinez stated, "it almost looked like [defendant was] trying to go into traffic" or "trying to get across" or "run in between," because defendant was kind of "lunging forward." Significantly, however, Martinez testified that he never saw defendant enter the roadway. Instead, Martinez testified that defendant was "really, really close to the road" and cars were slowing down near defendant. Martinez testified that he started seeing traffic build up. Martinez further testified that he called 9-1-1 to report what he saw to avoid any tragedies. When asked by the 9-1-1 dispatcher if defendant was on the highway, Martinez replied that defendant was by the highway and that he almost got hit by a car.

Another witness, Ann, also called 9-1-1 and reported that defendant was on Highway 18 parked on the side of the road and sitting in the back of his vehicle.[1] Ann stated that a truck drove by and, because it was windy, it seemed like it was going to hit defendant. The dispatcher asked if defendant was out in the road or over the fog line, to which Ann replied, "Yeah. *** [H]e was getting stuff and like putting it on the side of his car."

Officer Miller received a report that defendant was seen "running in the roadway." Miller went to the scene about an hour later and spoke with defendant. When Miller arrived, defendant's vehicle was parked in a grassy area near the highway and not in the fog line area, and defendant was standing on the side of the road with some signs; Miller did not see defendant obstructing any traffic. After speaking with defendant, who denied ever entering the roadway, Miller allowed him to remain on the side of the road and did not arrest him. Defendant, however, was ultimately charged by information with disorderly conduct in the second degree,

_____

[1] Ann's last name is not clear from the 9-1-1 recording, therefore we refer to her by her first name.

ORS 166.025, and offensive littering, ORS 164.805.[2] At trial, Miller testified that where defendant's vehicle was parked was close enough to the highway that he was nervous just standing there. A picture of defendant's vehicle parked off the side of the road is included in the appendix for reference.

At the close of the state's case, defendant moved for an MJOA, challenging the sufficiency of the evidence supporting his conviction for disorderly conduct in the second degree. ORS 166.025(1)(d) provides that "[a] person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person *** [o]bstructs vehicular or pedestrian traffic on a public way." In defendant's view, the statute demonstrates that, for a person to "obstruct" traffic, a person must physically "impede" or "block up" traffic. According to defendant, although his conduct might have been visually distracting or concerning, he did not physically impede vehicles from travelling along the roadway. The trial court denied defendant's motion, concluding that, viewing the evidence in the light most favorable to the state, a reasonable trier of fact could have found that defendant's conduct, even if not in the lane of travel, impeded traffic on the highway by causing passing vehicles to slow down and traffic to build up. Following a bench trial, the trial court found defendant guilty and entered a judgment of conviction.

In his sole assignment of error, defendant asserts that the trial court erred in denying his MJOA on the charge of disorderly conduct in the second degree. As described above, the trial court denied the motion, concluding that defendant did not have to be in the lane of travel to obstruct traffic under ORS 166.025(1)(d), but that it was enough if his presence by the road impeded or hindered the vehicles in the road.

We turn to our process for addressing an assignment of error to a trial court's denial of an MJOA that depends on the meaning of the criminal statute at issue.

"When a defendant's challenge to the legal sufficiency of the state's evidence depends upon the meaning of the statute defining the offense, we review for legal error. Then, based on the proper construction of the statute, we view the

---

[2] Defendant was acquitted of the offensive littering count.

evidence in the light most favorable to the state to determine whether a rational factfinder could have found the elements of the offense beyond a reasonable doubt."

*State v. Street*, 317 Or App 1, 4, 505 P3d 425, *rev den*, 369 Or 705 (2022) (citation and internal quotation marks omitted).

The meaning of the term "obstructs" in ORS 166.025(1)(d), is a question of statutory construction. To discern the legislature's intent in enacting that provision, we first consider the text and context of the statute, which is the best evidence of the legislature's intent. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We may then also consider the legislative history of the statute and give it the weight that we consider appropriate. ORS 174.020(3); *Gaines*, 346 Or at 171-72.

When the legislature has not defined a statutory term, but the term includes "words of common usage," we examine its "plain, natural, and ordinary meaning," which is usually accomplished by reference to a dictionary. *State v. Castillo*, 313 Or App 699, 705, 495 P3d 191 (2021). "If a term has more than one meaning, the context of its use guides our determination of which of multiple meanings the legislature intended." *State v. Snodgrass*, 325 Or App 234, 238, 528 P3d 1193 (2023). A statute's context "includes other provisions of the same or related statutes, the pre-existing statutory framework within which the statute was enacted," and prior decisions interpreting the relevant statutory wording. *Ogle v. Nooth*, 355 Or 570, 584, 330 P3d 572 (2014).

ORS 166.025(1)(d) provides:

"A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, the person:

"* * * * *

"(d)   obstructs vehicular or pedestrian traffic on a public way[.]"

The legislature has not defined the term "obstructs" in ORS 166.025(1)(d), but we have addressed its meaning in prior cases as discussed below. Because ORS 166.025 does not

define "obstructs," we first look to the ordinary meaning of the term. *Gaines*, 346 Or at 171-172. As we discuss below and based on our recent case law, the following dictionary definition is the most likely one intended by the legislature: "To block up : stop up or close up : place an obstacle in or fill with obstacles or impediments to passing ‹traffic [obstruct] ing the street› ‹veins [obstruct]ed by clots›." *Webster's Third New Int'l Dictionary* 1559 (unabridged ed 2002).

As noted, defendant argues that "obstructs" includes a physical requirement. He asserts that the legislature intended "obstructing" vehicular traffic under ORS 166.025(1)(d) to apply to persons who physically "impede" or "block up" traffic, and the duration and extent of the obstruction must be of such degree that the obstruction was intended to cause and risked causing a breach of the peace. We agree that the statute requires that the conduct (obstruction) must, at minimum, create a risk of causing public inconvenience, annoyance, or alarm. We also agree that our case law supports the conclusion that the term "obstructs" includes a requirement that a defendant physically impede traffic rather than distract those in traffic from the side of the road.

We turn to our case law. In *State v. Moore*, 327 Or App 91, 533 P3d 1123, *rev den*, 371 Or 771 (2023), the defendant was found intoxicated, walking down the middle of a two-lane road with a truck following behind him. *Id.* at 92. We agreed with the parties that the above-quoted dictionary definition of "obstruct" was the most likely intended meaning adopted by the legislature. *Id.* at 95. We affirmed the defendant's conviction. We determined that a reasonable factfinder could find that, by walking in the middle of a two-lane road at night, the defendant had created a sufficient risk of public inconvenience, annoyance, or alarm to support a conviction for disorderly conduct by obstructing traffic. *Id.* at 98. We explained that although the defendant did not block all lanes of traffic, an individual need not entirely block all passage to have "obstructed" traffic. *Id.* Although there was only one vehicle on the road at the time, we concluded that the state need not prove actual public inconvenience, annoyance, or alarm to any specific number of people. *Id.*

Further, not only would a member of the public be required to get around the defendant by entering the oncoming traffic lane or driving on the shoulder, but it was also reasonable to infer from the circumstances that a member of the public driving behind the defendant would be alarmed about passing at all. *Id.*

We also upheld convictions for second-degree disorderly conduct on an obstruction of vehicular traffic theory when environmental activists had established a human chain across a bridge—they blocked logging trucks from passing the bridge and successfully did so for four hours. *State v. Hund*, 76 Or App 89, 91-93, 708 P2d 621 (1985), *rev den*, 300 Or 477 (1986). Additionally, in another case, we affirmed the denial of an MJOA where the defendants caused a traffic backup that was up to "30 cars deep" by "stepping in front of" cars to pass out leaflets. *State v. Horn*, 57 Or App 124, 130, 643 P2d 1338 (1982). In *Horn*, we found it significant that there was evidence that the defendants were in the public right of way. *Id.*

We reached a different result in a related context where a defendant was exercising their free speech rights and did not prevent pedestrian traffic from moving around the defendant. In *City of Eugene v. Lee*, 177 Or App 492, 34 P3d 690 (2001), the defendant, a street preacher, was convicted of disorderly conduct under a provision of the Eugene City Code identical to ORS 166.025(1)(d). *Id.* at 494. He contended that the city code could not be constitutionally applied to him without violating his free speech rights under Article I, section 8, of the Oregon Constitution. *Id.* at 496. The defendant was loudly preaching at a mall, calling some passersby offensive terms, and causing a crowd to gather around him on the south side of the mall, which was over 50 feet wide. *Id.* at 494-95. Pedestrian traffic could get by to the north of where the defendant and the crowd were gathered. *Id.* at 495. *Lee* cited all three dictionary definitions of the word "obstruct,"[3] including the one cited above, as well as the

---

[3] "Obstruct" is defined as "**1 :** to block up **:** stop up or close up **:** place an obstacle in or fill with obstacles or impediments to passing <traffic ˜ing the street> <veins ˜ed by clots> **2 :** to be or come in the way of **:** hinder from passing, action, or operation **:** impede, retard <unwise rules ˜ legislation> <constant interruptions ˜ our progress> **3 :** to cut off from sight **:** shut out <the high wall ˜ed the view[.]"

word "obstruction," which refers to the "'act or condition of being obstructed' or a 'condition of being clogged or blocked.'" *Id.* at 503 (quoting *Webster's Third New Int'l Dictionary*, 1559 (unabridged ed 1993). In our application of that definition, we reasoned, "[g]iven those clear and common meanings, [the] defendant did not 'obstruct' pedestrian traffic," because those who did not wish to stop and listen could walk past the crowd unimpeded. *Id.* We concluded that the Eugene City Code provision could not be applied to the defendant's expressive activity without violating his free speech rights under Article I, section 8, of the Oregon Constitution. Accordingly, we reversed the defendant's conviction. *Id.*

Finally, we have reviewed the legislative history of the statute. The crime of disorderly conduct in the second degree was initially drafted by the Oregon Criminal Law Revision Commission (the Commission) and later enacted by the Oregon Legislature in 1971. Its legislative history includes the Commission's commentary. *See, e.g.*, *State v. Branch*, 362 Or 351, 363, 408 P3d 1035 (2018) (citing the Commission's commentary as legislative history for the revised criminal code and explaining that, absent evidence of a contrary intent, it is fair to assume "that the legislature accepted the commission's explanations for its drafting choices").

In its commentary to the offense of disorderly conduct, the Commission explained,

"Section 220 is designed to replace much of the existing law presently classified as 'vagrancy' and 'disturbing the peace'. *** This section is directed at conduct causing what the common law termed a breach of the peace. Before specific conduct may be viewed as 'disorderly,' the actor must intend to cause, or recklessly create a risk of, public inconvenience, annoyance, or alarm.

"*****

"Paragraph (e) covers the intentional obstruction of vehicular or pedestrian traffic. It is not intended to prohibit persons gathering to hear a speech or otherwise communicate."

---

*Webster's Third New Int'l Dictionary*, 1559 (unabridged ed 2002). The definition was the same when *Lee* was decided.

Commentary to the Criminal Law Revision Commission Proposed Oregon Criminal Code Final Draft and Report, § 220, 214 (July 1970). Section 220, paragraph (e), referenced above, is identical to the current version of ORS 166.025 (1)(d). Thus, the commentary is relevant to the issue of legislative intent. *State v. Valdez*, 277 Or 621, 625, 561 P2d 1006 (1977).

The commentary to the Proposed Oregon Criminal Code Final Draft and Report demonstrates the Commission's concern that paragraph (e) could be capable of being unconstitutionally applied to persons who are lawfully exercising freedom of speech. That legislative history focused on the actor's intent, so it does not provide much assistance in divining the legislature's understanding of the word "obstructs." However, it does provide some indication that the legislature was concerned about criminalizing expressive activity on the side of the roadway. A construction of the word "obstruct" that is based upon the physical conduct of impeding traffic in the roadway minimizes the risk that the statute could be applied to limit a person's free exercise of speech that occurs on the side of the roadway.

The text, context, and, to a lesser extent, the legislative history of ORS 166.025(1)(d) demonstrate that, in order to prove "obstruction," a person must physically "impede" traffic. We find particularly persuasive our prior cases that, when taken together, rely on a dictionary definition that requires a physical obstacle to vehicular passage rather than a distraction created by expressive or other activity on the side of the road that may affect the movement of traffic, cause it to slow, or cause drivers or passersby to become concerned.

Applying that construction to the statute, we turn to whether there was evidence that, when viewed in the light most favorable to the state, would allow a reasonable factfinder to find that defendant obstructed traffic beyond a reasonable doubt. *Street*, 317 Or App at 2. The state presented evidence from four witnesses—Hull, Martinez, Ann, and Miller—who all reported the same version of events: that defendant parked his vehicle on the side of the road. Crucially, none of the four witnesses observed defendant

actually enter the roadway to physically block or impede any vehicles from passing. At most, there was evidence that defendant might have passed the fog line on occasion to retrieve items that flew off his car and it might have appeared as if he was going to enter the road. But there was no evidence that defendant entered the roadway at a time that physically impeded any traffic. Further, the state's photographic evidence shows that defendant's vehicle was parked in a grassy area well beyond the fog line, completely off the asphalt. Appendix 1. Under those circumstances, the state failed to prove that defendant physically entered the roadway to impede or prevent any vehicles from passing.

Accordingly, even when viewing the facts in the light most favorable to the state, the evidence does not establish that defendant obstructed traffic, because the evidence does not demonstrate that defendant physically "[came] in the way of," "hinder[ed]" or "impeded" vehicular traffic. For the reasons discussed above we conclude that the trial court erred when it denied defendant's motion for judgment of acquittal.

Reversed.

## APPENDIX 1

